UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DEANNE MIKOLS and
THOMAS MIKOLS,

        Plaintiffs,

v.

REED CITY POWER LINE
SUPPLY CO., a/k/a Hydraker-
Wheatlake Co., and H & W
UTILITY GROUP II, LLC,

        Defendants.
_____/

Case No. 1:07-CV-84

Hon. Richard Alan Enslen

**OPINION**

        This matter is before the Court on Defendants Reed City Power Line Supply Co. and H & W Utility Group II, LLC's Motion for Summary Judgment. Plaintiffs Deanne and Thomas Mikols, through counsel, have opposed the Motion. Upon review of the complete briefing, the Court determines that oral argument is unnecessary. *See* W.D. Mich. LCivR 7.2(d).

**BACKGROUND**

        This suit was filed on January 26, 2007 alleging various acts of workplace discrimination against Defendants in violation of federal and state law.[1] Plaintiffs then, with Court permission, filed an Amended Complaint on July 9, 2007.[2] The Amended Complaint is set forth in eight counts,

---

    [1]Defendants are multiple business entities which operate the Reed City power business which employed Plaintiff Deanne Mikols. The corporate organization of the companies are explained in Defendants' Motion for Summary Judgment, at 1 & n.1, though that organization is largely irrelevant for the purpose of the current analysis.

    [2]The Amended Complaint lists Thomas Mikols as a Plaintiff, but both the Amended Complaint and the summary judgment record fail to even include allegations concerning Thomas Mikols which could give rise to liability. For this reasons, the balance of this Opinion discusses

though counts 7 and 8 were previously dismissed pursuant to a Stipulation of the parties. (*See* Apr. 16, 2008 Order of Dismissal, Dkt. No. 42.) What remains are four federal counts and two state law counts: Count One for gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*; Count Three for retaliation in violation of Title VII, 42 U.S.C. § 2000e-3(a); Count Five for violation of the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d); Count Six for retaliation in violation of the EPA, 29 U.S.C. § 206(d); Count Two for gender discrimination in violation of Michigan's Elliott-Larsen Civil Rights Act ("ELCRA""), Mich. Comp. Laws §§ 37.201 *et seq.*; and Count Four for retaliation in violation of ELCRA, Mich. Comp. Laws § 37.2701(a).

Deanne Mikols was offered the position of human resources manager by letter of the Chief Financial Officer, Charles H. Holmquist, dated March 24, 2004. (Pls.' Ex. 1.) Contemporaneous documents describing her job duties detailed a position with job duties broader than a traditional human resources corporate position, including, for example, safety program assistance, insurance claims administration and automobile expense compensation (the Runzheimer plan). (Pls.' Ex. 2 & 5; Mikols Dep. 63-64, 85-88.) The position was also written with the expectation that Mikols was to initially establish the human resources department. (Mikols Dep. 58.)

Plaintiff's first formal performance review was in May 2005 and was conducted by CFO Charles Holmquist. (*Id.* at 234; Mikols Dep. Ex. 7.) That evaluation was generally satisfactory and Mikols received a six percent raise. (Mikols Dep. 234-35; Mikols Dep. Ex. 7 at 2.) At that time, Holmquist emphasized a need for Plaintiff to "showcase" human resources to management by identifying company priorities and accomplishing related projects. (Mikols Dep. 225-26.) The communication styles and needs of the various members of the management team were also

---

the claims of Plaintiff Deanne Mikols.

discussed to foster improvement of Mikols' communications with management. (*Id.* at 226-27; Mikols Dep. Ex. 7 at 1.)  Another need discussed was increased productivity, including more dedicated work hours by Mikols. (Holmquist Dep. 117-18; Mikols Dep. Ex. 7 at 2.)

Following this review, in the later part of 2005, Chief Executive Officer Frank Wheatlake became disappointed in Plaintiff's general liability claim processing due to delay in closing open claims. (Wheatlake Dep. 17-20.) Wheatlake complained to Holmquist about this issue on multiple occasions. (*Id.*) Wheatlake had not been enchanted with Plaintiff's performance because she did not, in his opinion, address risk management as an urgent matter and did not have a sufficient demeanor to add value to the business. (*Id.* at 20-21.) Due to delays in claim process, Wheatlake eventually took the liability claim processing responsibility away from Mikols. (*Id.* at 19.) Prior to doing so, Wheatlake thought the H.R. manager would perform claim administration so as to allow him to focus on marketing the company. (*Id.* at 11-12.)

Things went from bad to worse for Plaintiff in the first week of April 2006. Then Mikols was asked by President and Chief Operating Officer Michael Bigford to assist in the termination of a warehouse employee, Tony Johnson, who had attendance and performance problems. (Bigford Dep. 11.) Despite that local management felt termination was appropriate, Plaintiff expressed some very generalized concerns about compliance with the Americans with Disabilities Act and the Family and Medical Leave Act.[3] (*Id.* at 11-12.) When Bigford asked Mikols to document that those statutes applied to the termination, she failed to do so. (*Id.*) This incident occurred when Holmquist was on

---

[3]In Mikols' deposition, she admitted that she did not know whether the employee was disabled and that the employee had not requested a workplace accommodation. (Mikols Dep. 182.) In Mikols' view, she had not reached a conclusion that the ADA applied and "was [simply] cautioning Mike Bigford . . . to be aware of [the] ADA." (*Id.*)

vacation. (Holmquist Dep. 177.) Nevertheless, Bigford went to the office of Controller Denise Herweyer and announced that "he was getting on the bus with Frank [Wheatlake]" in terms of firing Mikols. (Herweyer Dep. 52.) Bigford's frustration and the frustration of Johnson's immediate supervisor, who felt that Mikols was not supportive of the company's termination decision, was then communicated to Holmquist during a later meeting in which Bigford told Holmquist that human resources does not run the company.[4] (Holmquist Dep. 175-78.)

Holmquist, not immune to the views of fellow management, decided when he returned from vacation that Mikols should be terminated. (*Id.* at 194-95.) There was no single event, according to Holmquist, which led to the termination, but rather the culmination of Mikols' failure to improve her communications with management and her failure to handle certain assigned duties such as the liability claim processing. (*Id.*) While Holmquist made the decision to terminate Mikols, he communicated that decision to other members of the management team (Wheatlake, Bigford and Frank Pellerito) and they were supportive of that decision. (*Id.* at 197-98.) Mikols was terminated effective May 12, 2006. (Am. Compl. ¶ 1.)

Mikols' account of her termination is colored by events which she perceived to be discriminatory or retaliatory. On one occasion, she was present when Wheatlake, at a management meeting, used the term "shanty bitches" to refer to female employees. (Mikols Dep. 285.)

---

[4] Michael Bigford also told Plaintiff and Safety Director Thomas Dyer during a management meeting that human resources and safety would not run the company, operations would run the company. (Bigford Dep. 13.) Mikols testified that Bigford said this twice during separate management meetings, though not in reference to particular employment decisions. (Mikols' Dep. 122, 173-75.) Notwithstanding Mikols' frustration with Bigford, her description of the comments indicates that these comments were intended to instruct supervisors about general management roles. (*Id.* at 14.) That kind of description does not support an inference that the statements indicate a discriminatory animus.

4

Wheatlake has since explained that the term is a colloquialism that linemen used in the 1960's and '70's to refer to the job-site clerk, of either sex, who kept time records and issued payroll checks. (Wheatlake Dep. 33-34.)

Another subject which troubled Mikols was the comparative pay of company management and the issuance of yearly bonuses.[5] Mikols was upset because the safety manager and risk assessment manager were paid more than she was paid in terms of both salary and bonuses. (Mikols Dep. 190-91.) Mikols expressed frustration concerning payment of bonuses to Denise Herweyer on a single occasion during the spring of 2006. (Herweyer Dep. 49-50.) Herweyer reported to Mikols, however, that only senior management (not she) determined the amount of such bonuses. (*Id.*) Mikols later prepared a one-page analysis which purports to show that her compensation was less favorable in comparison to the mean compensation for a human resources manager versus the compensation for the safety and risk assessment managers relative to the mean compensation in their fields. (Mikols Dep. 207; Pls.' Resp. Ex. 7.) This analysis was never actually delivered to Mikols' boss prior to her termination. (Mikols Dep. 207.) However, Mikols did send an earlier email to Holmquist about bonus payments which expressed a general concern that bonus payments be made equitably. (*Id.* at 199.)

---

[5]In addition to her concern about the comparative salaries and bonuses of the other managers, Mikols also was concerned that a list of 35 employees who received supplemental non-Christmas bonuses was bereft of women. (Mikols Dep. 189-90.) Mikols' testimony on this subject is so vague and non-specific that it is not probative. She simply did not know the basis on which the bonuses were paid and cannot identify any "similarly situated" male who received a bonus when she did not. In fact, according to the employer, the two managers with whom she compared herself–Risk Assessment Director Robert Cato and Dyer–were not paid these supplemental bonuses. (Defs.' Mot. for Summ. J. 16 n.13 (citing Holmquist Dep.16, which is apparently a mistaken citation).)

Other incidents troubling Mikols included a conversation between herself, Dyer and Holmquist. Mikols accuses Holmquist of rejecting a female applicant for a field safety position because of gender. (*Id.* at 123-25.) Both Dyer and Holquist deny the allegation. (Dyer Dep. 57; Holmquist Dep.166-68.) That conversation apparently did not adversely affect the applicant–who was not considered because of a separate reason–*i.e.,* the company was required to hire a union worker as opposed to an outside applicant. (Mikols Dep. 126.) Even accepting Mikols' account, which accuses Holmquist of following unknown directives from upper management concerning sexual stereotyping as to field safety positions, the record does not support any inference that this kind of stereotyping affected in any way later and distinct company decisions about Mikols' position--an existing office management position in an area (human resources) often staffed by women.

Plaintiff has also cited her complaints about the treatment of a female employee in Indiana who was complaining about harassment. Even though Mikols asks the Court to infer that she was somehow seeking to protect the complainant from sexual harassment, the record does not support that the harassment was sexual in nature. (*Id.* at 178.) The record also does not support that the complainant was treated unfairly and Plaintiff herself agreed that the final severance agreement with the complainant was a proper disposition. (*Id.* at 178-79.)

Whatever the cause of the termination, the record is also clear that the employer did not hire another human resources manager. Rather, Defendants contracted with an outside human resources firm (Axios, Inc.) to do certain human resources projects and otherwise assigned the role to existing management and employees, especially Tracy Bosbous (who then held the junior human resources position). (Holmquist Dep. 200-02.) Mikols describes the transition as that "those duties are now

handled by no less than seven people and two outside businesses . . ." (Pls.' Resp. 7.) This number included existing management and employees, the Axios, Inc. firm, and defense counsel. (*Id.*)

### **STANDARDS FOR SUMMARY JUDGMENT**

Defendants' Motion is brought pursuant to Federal Rule of Civil Procedure 56. Under the language of Rule 56(c), summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The initial burden is on the movant to specify the basis upon which summary judgment should be granted and to identify portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden then shifts to the non-movant to come forward with specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). If, after adequate time for discovery on material matters at issue, the non-movant fails to make a showing sufficient to establish the existence of a material disputed fact, summary judgment is appropriate. *Celotex Corp.*, 477 U.S. at 323. In assessing evidence, credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences are jury functions. *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994). The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor. *Celotex Corp.*, 477 U.S. at 323 (quoting *Anderson*, 477 U.S. at 255). The factual record presented must be interpreted in a light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**LEGAL ANALYSIS**

**1.  Legal Overview**

There is a general legal framework which has grown up around both employment discrimination and retaliation suits.  This framework includes such cases as *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981), and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993).  *See also Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004); *Sutherland v. Mich. Dep't of Treasury,* 344 F.3d 603, 614 n.4 (6th Cir. 2003); *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999).

Under this framework, a discrimination or retaliation claim may be proven by either direct or circumstantial evidence of discrimination. "Direct evidence" means "evidence which, if believed, requires no inference to conclude that unlawful retaliation was a motivating factor in the employer's action." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008) (citing *Abbott v. Crown Motor Co.,* 348 F.3d 537, 542 (6th Cir. 2003)).  Such "direct evidence" cases are "rare," *Jackson v. FedEx Corporate Servs., Inc.*, 518 F.3d 388, 394 (6th Cir. 2008), and generally consists of cases where the employer makes admissions of a discriminatory or retaliatory motive in the context of the challenged employment action.  *See Imwalle*, 515 F.3d at 544 (citing *Christopher v. Stouder Mem'l Hosp.,* 936 F.2d 870, 879 (6th Cir. 1991)).

In distinction from those rare cases, the more typical circumstantial case requires use of the *McDonnell Douglas* framework.  Under this framework, a plaintiff makes a *prima facie* case of discrimination by proving by a preponderance of the evidence that: (1) she was a member of a protected group; (2) she was qualified for her position; (3) she was subjected to an adverse employment action; and (4) she was replaced by a person outside of the protected class or treated less

8

favorably than a similarly situated non-protected employee.  *See McDonnell Douglas*, 411 U.S. at 802; *Knox v. Neaton Auto Prods. Mfg., Inc.*, 375 F.3d 451, 456-57 (6th Cir. 2004); *see also Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 521 (Mich. 2001) (applying standards to ELCRA claims).

**2. Title VII/ELCRA Discrimination Claims**

Plaintiff's Counts One and Two fail because there is no "direct evidence" of gender discrimination and Plaintiff has not made her circumstantial case supporting an inference of discrimination.  The various comments identified as offensive by Plaintiff were not referencing her termination and require a long and contorted series of inferences to reach a conclusion of discrimination.  As such, those statements and unrelated actions do not qualify as "direct evidence."

In terms of the *McDonnell Douglas* framework, it is equally clear that Plaintiff has not made a *prima facie* case of discrimination relating to her firing.  Most obviously, her position was not replaced by any one person, so an inference of discrimination is not permitted. *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003); *Ililley v. BTM Corp.*, 958 F.2d 746, 752 (1992). Additionally, even if one were to assume that she was replaced by Tracy Bosbous (the personnel assistant to whom most of her responsibilities were given), then that replacement would not support an inference of discrimination because Bosbous is a member of the protected class.

To the extent that Plaintiff argues that the discrimination consisted in the payment of greater wages and bonuses[6] paid to Dyer and Cato, she has also failed to prove either a direct or

---

[6] As noted earlier, the record does not support that they in fact received supplemental bonuses.  Christmas bonuses were paid to all employees, including Mikols.  (Mikols Dep. 187.)

9

circumstantial claim.[7] The decision makers who determined the salary and wage structure have not made any admissions of illegal discrimination in the context of salary and bonus payments, so there is no direct evidence of illegal discrimination. Likewise, she cannot make an inferential case because those managers were not "comparables . . . similarly situated *in all respects*." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (emphasis in original). Namely, those managers were assigned duties with respect to risk and safety management–in a company using high-voltage power lines. They also had very different technical and work backgrounds from Plaintiff. (Holmquist Aff., Exs. 1 & 2.) Wheatlake assessed that the safety function was "the most important thing in our industry." (Wheatlake Dep. 30-31.) The payment of different salary and bonuses to those managers under those conditions cannot constitute illegal discrimination as a matter of law.

### 3. Title VII/EPA/ELCRA Retaliation Claims

As noted above, the same direct/circumstantial evidence framework from the *McDonnell Douglas* line of cases applies equally to the retaliation claims brought in this suit. Absent direct evidence of retaliation, a *prima facie* case of retaliation is proven by evidence establishing: (1) that plaintiff engaged in some statutorily protected activity; (2) that the employer knew of the protected activity; (3) that the employer took an adverse employment action against plaintiff; and (4) there is a causal connection between the protected activity and the adverse action. *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002); *Mitchell*, 964 F.2d at 582.

---

[7]Plaintiff also claimed that she was treated differently from Cato because he was permitted to purchase an HRIS software program but she was not. Even assuming this disputed allegation to be true, the non-purchase of the software does not, as a matter of law, constitute an "adverse action" giving rise to discrimination liability. *See Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998).

Each of these statutes define "protected activity" in a similar manner. Under Title VII, protected activity arises when the plaintiff "has opposed any practice made an unlawful practice under this subchapter, or . . . has made a charge, testified, assisted, or participated in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a); *see also DiCarlo v. Potter*, 358 F.3d 408, 420 (6th Cir. 2004). The retaliation provisions of the EPA and ELCRA essentially mimic this Title VII language. *See* Mich. Comp. Laws § 37.201(a); 29 U.S.C. § 215(a)(3).

In this case, Plaintiff never made any formal Title VII, EPA or ELCRA charge of discrimination, nor participated or testified in any proceeding seeking to establish statutory liability for discrimination. While Plaintiff does argue that she has opposed conduct made unlawful by the various statutes, this is not apparent on this record. The only communications that Plaintiff had with management which would even arguably qualify were Mikols' general email to Holmquist stating that "I think we need to be cautious and be treating people equitably" with respect to bonuses (Mikols Dep. 199) and the conversation that Plaintiff had with Michael Bigford about being cautious that Tony Johnson's termination not be in violation of the ADA or FMLA. (Bigford Dep. 11-12.)

Under Sixth Circuit precedent, the making of an informal complaint to an employer about discrimination constitutes "protected activity" under Title VII, the EPA and ELCRA. *E.E.O.C. v. Romeo Cmty. Schs.*, 976 F.2d 985, 989-90 (6th Cir. 1992); *Moore v. Freeman*, 355 F.3d 558, 562-63 (6th Cir. 1992). Also, even legally mistaken complaints receive protection from retaliation provided that the employee had at least a good faith belief that the conduct complained about was unlawful. *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1312-13 (6th Cir. 1989) (citing cases).

11

Of course, the Circuits which have recognized that an informal complaint may constitute "protected activity" are aware that this protection places the employer in a difficult position in determining when protected activity has occurred. *See Valerio v. Putnam Assocs., Inc.*, 173 F.3d 35, 44 -45 (1st Cir. 1999) (expressing concern). Nevertheless, those courts have decided that whether particular informal complaints constitute "protected activity" is a question properly resolved on a case-by-case basis. *Id.*

Such has been the practice of the Sixth Circuit. In *Booker*, the Sixth Circuit held that a letter of complaint to human resources about a "racist" supervisor was too vague to constitute protected activity. *Booker*, 879 F.2d at 1313. A contrary decision was reached by the Circuit in *Romeo Cmty. Schs.*, 976 F.2d at 989-90, which held that an informal complaint by a female employee that the employer was "breaking some sort of law" by paying her less than men was protected activity. The more recent case of *Fox v. Eagle Distrib. Co., Inc.*, 510 F.3d 587, 591 (6th Cir. 2007) followed *Booker* due to the vagueness of the complaint. *Fox* considered an employee who made informal complaints about age discrimination (under the Age Discrimination in Employment Act, 29 U.S.C. §§ 623 *et seq.*) without referring to specific conduct which may have been in violation of the statute. The Sixth Circuit held that these complaints were too vague to constitute opposition to an unlawful employment practice. *Id.*

Given this guidance, the Court determines that neither of the complaints were specific enough to constitute protected activity under the labor laws. Mikols' email complaint about the bonuses does have some superficial similarity to the complaint in *Romeo Cmty. Schs.* However, the precise language of the complaint is more general. That language--"I think we need to be cautious and be treating people equitably . . . ." (Mikols Dep. 199)--does not clearly inform the employer that

12

gender discrimination as opposed to compensation based on results or seniority was Mikols' concern. The same conclusion applies to Mikols' very generalized comments about being cautious in terminating Johnson. Those comments were exactly the kind of generalized comments excluded from protection in *Fox* since they lacked specific factual references which would inform the employer of the serious nature of the complaint at issue. It is telling in this regard that the employer responded by asking for a more specific statement of Mikols' concerns, which the employer never received.

Furthermore, while the latter comment about Johnson's termination may have been factually related to Mikols' termination, the record does not support any inference that the email comment about "treating people equitably" played any role in the termination of Mikols' position. Rather, the record supports only that the company's general issues with Mikols' performance, including especially her handling of insurance claims and her performance as to the Tony Johnson incident, were the causes of her termination. As such, summary judgment for Defendants is warranted as to all of the retaliation claims.

### 4. EPA Equal Pay Claim

Unlike discrimination and retaliation claims, EPA claims have a different statutory basis and different rules for adjudication. The general framework was explained well by the Sixth Circuit in *Beck-Wilson v. Principi*, a case involving disparate pay for nurse practicianers:

> The EPA prohibits employers from paying an employee at a rate less than that paid to an employee of the opposite sex for performing equal work. *See* 29 U.S.C. § 206(d)(1). In order to establish a prima facie case of wage discrimination under the EPA, plaintiffs must show that an employer pays different wages to employees of opposite sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S. Ct. 2223,

13

>41 L. Ed. 2d 1 (1974) (quoting 29 U.S.C. § 206(d)(1)). Jobs need not be identical in order to be considered "equal work" under the EPA. *Shultz v. Wheaton Glass Co.,* 421 F.2d 259, 265, & n.10 (3d Cir.), *cert. denied,* 398 U.S. 905, 90 S. Ct. 1696, 26 L. Ed. 2d 64 (1970). Whether a job is substantially equal for purposes of the EPA is determined on a case-by-case basis and "resolved by an overall comparison of the work, not its individual segments." *Odomes v. Nucare, Inc.,* 653 F.2d 246, 250 (6th Cir. 1981) (orderlies and nurses aides perform substantially equal work).
>
>"Unlike the showing required under Title VII's disparate treatment theory, proof of discriminatory intent is not required to establish a prima facie case under the Equal Pay Act." *Peters v. City of Shreveport,* 818 F.2d 1148, 1153 (5th Cir.), *cert. denied,* 485 U.S. 930, 108 S. Ct. 1101, 99 L. Ed. 2d 264 (1988), *abrogated on other grounds, Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989). "Once the plaintiff establishes a prima facie case, the defendant must 'prove' that the wage differential is justified under one of the four affirmative defenses set forth under § 206(d)(1) of the Equal Pay Act: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex." *Buntin v. Breathitt County Bd. of Educ.,* 134 F.3d 796, 799 (6th Cir.1998) (citing *Corning Glass Works,* 417 U.S. at 196, 94 S. Ct. 2223). Because these are affirmative defenses, the defendant bears the burden of proof. *See Corning Glass Works,* 417 U.S. at 197, 94 S. Ct. 2223; *see also EEOC v. Romeo Cmty. Schs.,* 976 F.2d 985, 988 (6th Cir. 1992).

441 F.3d 353, 359-60 (6th Cir. 2006).

Given these standards, it is clear as a matter of law that Plaintiff cannot succeed in her EPA claim. The comparison between herself and the safety and risk assessment managers are cross-discipline comparisons between managers performing fundamentally different roles. As Mikols admitted in her testimony, "they're different disciplines . . . Human resources is more directly involved in recruitment and benefit administration, employment policy, whereas safety is more directly involved in the day-to-day safety of the workers . . . ." (Mikols Dep. 105.) While the jobs being compared need not be identical, *see Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981) (allowing claim based on payment differences between orderlies and nurses), there must be substantial similarity of work to apply the EPA.

14

In this instance, the comparison between an in-office business management position and two work-site safety and facilities engineering positions is simply too far afield in terms of the tasks performed, the educational requirements, and the employer expectations. Also, Dyer and Cato's experience and education levels (*see* Holmquist Aff. ¶¶ 4-8 & Exs. 1 & 2.) likewise warranted differences in pay. As such, Plaintiff's EPA claim fails as a matter of law.

### **CONCLUSION**

For the reasons given, Defendants' Motion for Summary Judgment will be granted and Judgment shall issue dismissing all of Plaintiffs' claims with prejudice.

|  |  |
|---|---|
| DATED in Kalamazoo, MI:<br>July 1, 2008 | /s/ Richard Alan Enslen<br>RICHARD ALAN ENSLEN<br>SENIOR UNITED STATES DISTRICT JUDGE |